# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **BRUCE DILLARD,** | ) Case No. 1:05 CV 855 |
| | ) |
| Petitioner, | ) Judge Dan Aaron Polster |
| | ) |
| vs. | ) **MEMORANDUM OF OPINION** |
| | ) **AND ORDER** |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Respondent. | ) |

On March 31, 2005, Petitioner Bruce Dillard filed a *pro se* Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence, asserting six grounds for challenging the constitutionality of his convictions. *ECF No. 1* ("Petition"). On April 20, 2005, the Court issued a Memorandum of Opinion and Order summarily dismissing the Motion pursuant to Rule 4(b) of the Rules Governing § 2255 Proceedings. *ECF No. 4*. On appeal, the Sixth Circuit vacated the summary dismissal of Dillard's ineffective assistance of counsel claims, and otherwise affirmed this Court's rulings. *ECF No. 8*. The Sixth Circuit remanded the case directing this Court to determine the following limited questions:

> 1) whether Dillard's claims were barred by an unexcused procedural default insofar as he alleged that he had been denied the effective assistance of counsel because his attorney failed to investigate and present eyewitness accounts of the drug raid that led to his arrest, failed to make an effective argument regarding selective prosecution, and failed to present evidence that the arresting officers were biased against him because of his race; and 2) whether these ineffective assistance of counsel claims otherwise have substantive merit.

*Id*. at 2.  The Court thereafter entered a schedule for the parties to brief these discrete issues. *ECF No. 10*.  The Court has reviewed the Government's response to the Petition, *ECF No. 11*, and Dillard's reply thereto, *ECF No. 12*, and is prepared to issue its ruling.

**I.**

Following are the factual and procedural history of the underlying criminal case, as succinctly summarized by the Sixth Circuit in its review of Dillard's direct appeal.

> In May 1999, police officers began investigating a two-story apartment house located at 7433 Clemont Avenue, Cleveland, Ohio, as a result of complaints about drug activity at that address. Using an informant, the officers made two controlled buys of cocaine base (crack) from Dillard. The first, on May 6, 1999, occurred at that address, and the second, on May 12, occurred just after Dillard left that address. Each time, Dillard sold the officer an amount of crack worth sixty dollars.
>
> On May 26, 1999, the police obtained a search warrant for the upper residence at 7433 Clemont. The police were also aware that there was a felony warrant on an unrelated matter for Dillard's arrest at that time. Seven officers approached the side door of the apartment in a single file line, and three other officers were stationed around the house for security. As the police approached the premises, they observed Dillard and another male, Steven Piskach, exiting the residence from the side door. Dillard was carrying a briefcase. Sergeant Thomas Acklin announced "Police, search warrant," or "Police, put your hands up," or words to that effect. At that time, Dillard and Piskach were outside the house, in the driveway.
>
> Dillard then tossed the briefcase onto the ground. He had been holding it in his right hand and threw it to the left. According to the testimony of detectives James Kennelly and Bienvenido Santiago, the briefcase "went flying" and landed about four feet away. Dillard began to struggle with the officers and, with his right hand, he pulled a loaded 9mm gun (later determined to contain ten rounds of ammunition) from his waistband. In an altercation lasting forty-five seconds to a minute, the officers moved Dillard onto the ground and removed the loaded gun from his hands.
>
> Dillard was placed under arrest. The police opened Dillard's briefcase and discovered 99.21 grams (or about 3.5 ounces) of crack, an inoperable weapon, assorted drug paraphernalia, and plastic bags used for packaging cocaine. Sergeant Acklin, qualified as an expert in narcotics enforcement, estimated that

the street value of the crack recovered from Dillard's briefcase could be $3,000 to $4,000 if sold in ounces or "almost $10,000 worth" if sold in $20 "rocks."

*   *   *

On June 30, 1999, a federal grand jury indicted Dillard on three counts: (1) possession with intent to distribute approximately 3.5 ounces of cocaine base, in violation of 21 U.S.C. 841; (2) using, carrying, and brandishing a firearm in relation to drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1); and (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

Dillard moved to suppress the evidence found in the briefcase, and the district court held an evidentiary hearing on November 18, 1999. The district court denied Dillard's motion to suppress, finding that the search of the briefcase was incident to a lawful arrest and that the contents of the briefcase would have been inevitably discovered through an inventory search. The court also noted that "certainly there is more evidence than not" that Dillard discarded the briefcase, but at that time declined to address whether Dillard lacked standing to challenge the admission of the evidence because he had abandoned the briefcase.

The government filed an Amended Notice of Enhancement on December 22, 1999, which enhanced the statutory minimum for Count One from ten years to life without parole based on Dillard's prior convictions. On February 18, 2000, Dillard filed a renewed motion to suppress the evidence seized from the briefcase, but it was denied for the same reasons as the original motion. At the conclusion of Dillard's trial, on March 3, 2000, the jury returned guilty verdicts on all counts. On May 4, 2000, however, the district court declared a mistrial. The reason for the mistrial was the accidental inclusion of a search warrant affidavit in the exhibits provided to the jury.

On May 30, 2000, Dillard was named in a five-count superseding indictment charging him with the same three counts, plus two counts of distributing cocaine base in violation of 21 U.S.C. § 841. On September 8, 2000, Dillard filed a renewed motion to suppress the evidence found in his briefcase, and the district court denied the motion because it found that Dillard had abandoned the briefcase when he discarded it, such that he lacked standing to raise a Fourth Amendment challenge. Alternatively, the district court ruled that the search of the briefcase was incident to a lawful arrest, or that the contents of the briefcase would have been inevitably discovered during a routine inventory search.

On September 19, 2000, the government filed a Second Amended Notice of Enhancement that enhanced the statutory minimum for Count Three from ten

>years to life without parole. On November 15, 2000, Dillard filed another motion to suppress the briefcase evidence, but the motion was orally withdrawn two days later at a pretrial conference. The second jury trial commenced on November 27, 2000. It also resulted in a mistrial when, after the first day of trial, the police found a razor blade in the briefcase that had not been previously discovered.
>
>The third and final jury trial commenced on February 26, 2001. On March 1, 2001, the jury returned guilty verdicts on all five counts charged in the superseding indictment. Dillard was sentenced to life without parole for the conviction under Count Three and to a consecutive seven year term for the conviction under Count Four.

*U.S. v Dillard*, 78 Fed. Appx. 505, 507-08 (6th Cir. Oct. 20, 2003).

## II.

Under 28 U.S.C. § 2255, a federal district court may grant relief to a prisoner in custody under a sentence imposed by that court "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . ." *Id*. To prevail on a § 2255 claim, the petitioner must show a fundamental defect in the proceedings "which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Nagi v. United States*, 90 F.3d 130, 133-34 (6th Cir. 1996) (quoting *Gall v. United States*, 21 F.3d 107, 109 (6th Cir. 1994)).

## III.

Claims of ineffective assistance of counsel are analyzed under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish two elements: (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable

probability that, but for the deficiency, the outcome of the proceedings would have been different." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Strickland*, 466 U.S. at 694). A review of counsel's performance must be highly deferential and requires the Court to "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). An error by counsel, "even if professionally reasonable," will "not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. That is to say, it must be demonstrated that counsel's performance "caused the defendant to lose what he otherwise would probably have won" and that it was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (emphasis in original).

In evaluating whether Dillard's Sixth Amendment rights were violated by errors of counsel, the focus is on whether there was a breakdown in the adversarial process affecting the fundamental fairness of the trial and the reliability of the result. *Strickland*, 466 U.S. at 687, 696. Bare allegations of ineffectiveness are insufficient. Before a hearing on a habeas petition must be held, "the petition must be accompanied by a detailed and specific affidavit which shows the petitioner has actual proof of the allegations going beyond mere unsupported assertions." *Barry v. United States*, 528 F.2d 1094, 1101 (7th Cir. 1976).

**IV.**

**A.**

First, Dillard argues that his trial counsel was constitutionally ineffective for failing to investigate and present at trial eyewitness accounts of the drug raid that led to his

arrest. He contends that the testimony of these witnesses would have been "highly exculpatory" and would have rendered the jury's deliberations "entirely different." *Id.* at 6-8. As examples of such testimony, he has provided the affidavits of three persons who were present during the drug raid.

As a preliminary matter, the Court observes that, prior to filing this Petition, Dillard has never challenged the lawfulness of his arrest on May 26, 1999. *See, e.g., Doc. Nos. 21, 50 and 120* (respectively Motion to Suppress, Renewed Motion to Suppress, and Motion to Suppress); *see also Dillard*, 78 Fed. Appx. at 520 ("While it appears to be uncontested that Dillard's arrest was lawful, . . .") (Clay, C.J., dissenting). He has only challenged the constitutionality of the warrantless search of his briefcase by police officers outside the apartment. *Id.* The Court ruled that the search was constitutional, and this ruling was affirmed on appeal. One of the arguments, however, that Dillard made in support of his claim that the search of his briefcase was unlawful was that the police used excessive force in effectuating his arrest and, because they used excessive force, the evidence found in the briefcase should be suppressed. After hearing testimony from five defense witnesses (two police officers, a private investigator and two persons who were present during the raid) and one government witness (a police officer), the Court found that Dillard had failed to carry his burden of showing that the officers used excessive force in his arrest; thus foreclosing this avenue as a basis to suppress the incriminating evidence contained therein.[1] *See generally Supp. Hr'g Tr.* 144-54.

---

[1]The Court explained,
There has really been only one witness who testified as to the cause and circumstances for the struggle that occurred between Mr. Dillard and law enforcement officers, and I find his testimony credible.
I can't see any reason why he would come into court, take an oath and just flat out lie and invent the fact that he was in a fight for his life, and he was lucky

That said, Dillard appears to be trying to resurrect the excessive force issue in the guise of an ineffective assistance of counsel claim. Dillard concedes that, "[d]uring trial, counsel did aggressively cross-examine the prosecution witnesses." *Petition*, Ex. 2 at 3. However, counsel was deficient for failing to present eyewitnesses on his behalf who could testify that "he had no gun on his person, he was not in the apartment identified in the warrant, [he] never resisted arrest or brandished a firearm during his arrest, and he had obviously been beaten by police." *Id*. at 7. In support, he has provided the affidavits of George Jakubowski, who owned the apartment and was present on the evening of the drug raid; Steven Piskach who, along with Dillard, was apprehended by police when exiting the apartment; and Patricia Kance, who was present in the apartment during the raid.[2] I find that these affidavits do not support Dillard's claim for the following reasons.

First, it is undisputed that Dillard was outside the building when he was apprehended by the police and that Dillard had blood on his face when he was returned to the apartment by the officers. Neither Jakubowski nor Kance can testify about what occurred outside the apartment because they weren't there during the altercation. The only question, then, is whether Dillard pulled a gun on the officers when they were effectuating his arrest.

---

that gun didn't discharge into either Mr. Dillard, himself or others.
    So, I find that, in fact, if any force was used, it was to wrestle the gun away from Mr. Dillard. And the officer, Officer Kennelly was not cross examined at all on his testimony that, you know, that at the end of the whole evening or early the next morning when he asked Mr. Dillard why did he pull the gun, Mr. Dillard said, using an obscenity, I know [ ] how you police are. I would have killed as many of you as I could.
    I think that is a clear admission by the defendant, not only that he pulled the gun, but that he planned to use it to kill people.
*Supp. Hrg. Tr*. 153.

[2]The affidavits are attached to the memorandum in support of Dillard's Petition.

-7-

Jakubowski avers that Dillard had two guns that night, but that they were both in his briefcase when he left the apartment; however, Jakubowski does not know what happened with the guns after Dillard and Piskach walked out the apartment door. Kance's averment that she did not see a gun in Dillard's waistband has little evidentiary value. She was passing Piskach and Dillard (who was wearing a coat) on the stairway when they were leaving to buy beer and she was bringing Jakubowski's birthday dinner to him.

The only witnesses to the altercation between Dillard and the officers who are not law enforcement personnel are Dillard and Piskach. Dillard chose not to testify at the suppression hearing and has a constitutional right not to testify at trial – a right he exercised at all three trials. Piskach's latest averment, that he did not see a gun in Dillard's waistband when he put his coat on that night, directly contradicts his earlier sworn suppression hearing testimony when he stated that he didn't know if Dillard had a gun on him that night. *Compare Piskach Aff.* ¶ 2 *with Supp. Hrg. Tr.* 115 ("Q. Did [Dillard] have a gun on him that night? A. That I don't know."). Moreover, the Court had an opportunity to observe Piskach (who admitted to officers that he was drunk that night) on the witness stand and found him to be not credible.

Assuming these affidavits are exemplary of the witnesses counsel should have presented at trial, their testimony can hardly be called exculpatory and counsel cannot be deemed deficient for failing to call them.[3] They all tie Dillard to the upstairs apartment, indirectly to drug activity, and Jakubowski puts two guns in Dillard's possession. None of them contradict the government's evidence that Dillard pulled a gun on the officer who was trying to handcuff

---

[3]Dillard himself admits that "crack house 'groupees' are not the best witnesses." *Petition* at 15.

him, and that a violent struggle over the gun ensued. *See Supp. Hrg. Tr.* at 130 (Officer Kennelly); *ECF No. 11, Government's Response, Ex. C, 2/27/01 Trial Tr.* at 217-21. Dillard has presented no affidavit from any defense witness who was in a position to observe the struggle. Inasmuch as the witness affidavits do not recite facts which could create reasonable doubt about Dillard's guilt, the Court concludes that he has failed to set forth an ineffectiveness claim on this basis.

**B.**

Next, Dillard contends that trial counsel was constitutionally ineffective for failing to make an effective argument regarding selective prosecution. Specifically, Dillard argues that of all persons arrested during the drug raid, he was the only African American prosecuted in federal court. *Petition* at 10. Dillard asserts that he was prosecuted by the federal government because he refused to enter a plea bargain and because he complained of police misconduct.

The decision to prosecute an individual falls within the ambit of a prosecutor's discretion. Federal courts have jurisdiction over all offenses against the laws of the United States under 18 U.S.C. § 3231. Federal jurisdiction over this case is based, in part, on the Comprehensive Drug Abuse Prevention and Control Act of 1970. 21 U.S.C. §§ 801 to 966. Because Dillard violated the laws of two sovereigns, Ohio and the United States, either or both could have prosecuted him. *See United States v. Sitton*, 968 F.2d 947, 952 (9th Cir. 1992); *United States v. Figueroa-Soto*, 938 F.2d 1015, 1020 (9th Cir. 1991). These decisions are within the province of the executive branch of the government and will not be disturbed as long as there

is probable cause to believe that an accused has committed an offense. *Wayte v. United States,* 470 U.S. 598, 607 (1985).

Although the government's authority to bring charges against people who break the law is very broad, such discretion is not unlimited. Prosecutors may not engage in selective prosecution of individuals based solely on unconstitutional motives such as race or religion, or in retaliation for exercising a constitutionally protected right. *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001); *United States v. Baker*, 197 F.3d 211, 215 (6th Cir. 1999). To raise a selective prosecution claim, a defendant must show both that he was singled out for prosecution and that others, similarly situated, were not. He must also show that the government selected him to be prosecuted in bad faith. *Wayte*, 470 U.S. at 608; *Gardenhire v. Schubert*, 205 F.3d 303, 319-20 (6th Cir. 2000). The government enjoys a presumption that it undertakes prosecution in good faith, and defendants asserting selective prosecution bear the burden of presenting "clear evidence" showing otherwise. *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 489 (1999).

A selective prosecution defense is waived unless properly raised before trial. *United States v. Blair*, 214 F.3d 690, 698 (6th Cir. 2000). Dillard asserts that he asked his attorney to raise the issue of selective prosecution, to no avail, prior to his third trial and that he raised this issue in a letter to the Court but the Court refused to address it because he filed it on his own behalf while being represented by appointed counsel. *Petition* at 11. Dillard has shown no cause to excuse this procedural default.

Even if he had not procedurally defaulted this issue, it would still lack merit. There is no question that Dillard's prosecution was properly federal. There is plenty of evidence

in the record showing that Dillard was the prime trafficker of crack cocaine in the apartment subject to the search warrant because the informant bought drugs from him on both occasions – in fact, laying the factual predicate for obtaining the search warrant. Dillard possessed the largest amount of crack cocaine on the evening of the search. He was a repeat drug offender subject to enhanced penalties due to his recidivist criminal drug record. As the government reasonably noted in its brief, federal prosecution of a repeat drug offender who the state has been unable to deter furthers a federal interest in inhibiting the flow of crack cocaine on the local level and maximizing federal prosecution resources. *ECF No. 11* at 19. These are all lawful motives, apparent from the record and well known to Dillard's counsel upon receiving discovery of the search warrant affidavit and Dillard's prior criminal record. Dillard has failed to show that the other Caucasian persons arrested in the drug raid were otherwise similarly situated to him. There is no evidence that any of the others had a prior criminal record as extensive as his or that they possessed the amount of crack cocaine found in his briefcase; and while Jakubowski had a firearm on his person that night, there is no evidence that he brandished it when the police officers tried to arrest him. Under the circumstances, Dillard's counsel cannot be found deficient for failing to make an effective (i.e., winning) selective prosecution argument.[4]

## C.

Finally, Dillard contends that counsel was ineffective for failing to present evidence that the arresting officers were biased against him because of his race. This is not solely an ineffectiveness claim because Dillard is challenging the Court's alleged suppression of

---

[4] Dillard's conclusory assertion that he was prosecuted in federal court because he refused to enter a plea bargain is illogical because his decision not to enter a plea bargain occurred long after he was indicted by federal prosecutors.

racial bias testimony at the suppression hearing, as well as counsel's failure to question either of the police officers at that hearing about "racial slurs." *See Petition* at 14 ("Intentionally or not, the Court suppressed the racial bias and racial slurs testimony."). The Court's ruling denying the suppression motion has been affirmed by the Sixth Circuit and is the law of the case. Dillard's failure to raise this issue at the proper time is, therefore, waived.

In deciding the ineffectiveness claim, the test is whether the result would probably be different, i.e., Dillard must show that he would probably have won the suppression hearing and then that he would probably have been acquitted. He can't show this. The Court denied the motion to suppress on several grounds, including a finding that Dillard abandoned the briefcase, and the Sixth Circuit affirmed this. Accordingly, the alleged racial bias of the officers is irrelevant.

Even if this claim were not waived, the Court would find that Dillard's allegations in this regard are a complete mischaracterization of what occurred at the suppression hearing. During the cross examination of Detective Santiago, counsel asked the Detective whether he had ever spoken with Dillard before May 26, 1999. *Supp. Hrg. Tr.* at 85. The Detective answered, "No, I never talked to Mr. Dillard." *Id*. Counsel then asked, without any foundation whatsoever, "Detective Santiago, didn't there come a time where you expressed anger that Mr. Dillard was dating a white woman?" *Supp. Hrg. Tr.* at 86. The Court sustained the government's objection to this question. Defense counsel explained that he was asking the question to establish motive for the unreasonable treatment of Dillard "between the two houses that night." *Id*. The Court responded that he hadn't yet established that Detective Santiago did anything to Dillard, and counsel agreed. *Id.* The Court continued:

-12-

>    THE COURT: So before you establish the motive for doing anything improper, you have to determine that he did anything. At the moment all we have is that the officer identified him.
>    There is no question that he knew that this was Dillard. He said, "that's him." And then Officer Santiago said he testified he walked upstairs to conduct the search.
>    All right. So, do you have any reason to believe he didn't do that?
>    MR. TEREZ: No, I don't.
>    THE COURT: Then, all right. So I have already ruled that on the last question the objection is sustained.

*Id*. at 86-87.

Inasmuch as the Court has wide discretion in the admission of evidence and did not abuse its discretion in disallowing such questions without foundation, it cannot be maintained that counsel was ineffective for failing to follow the Court's instructions.

The Court notes that the Petition is the first time in this case that Dillard has mentioned anything about racial slurs. He has obviously procedurally defaulted this issue and failed to show any reason to excuse the default. To the extent that this claim is an effort to relitigate the excessive force issue raised and ruled on at the suppression hearing, and affirmed on appeal, it fails on the merits.

**D.**

While Dillard points the finger at his lawyer in this latest effort to overturn his conviction, the truth is that Dillard received a vigorous and effective representation. Dillard will spend the rest of his life in prison first, because of his criminal conduct, and second, because he rejected his attorney's advice that he accept the surprisingly favorable plea offer made by the government before the third trial.[5]

---

[5] *See* letter to Dillard from Donald Butler, Esq., attached to Petition.

As described above, Dillard's first two trials ended in mistrials, after some unusual events. Perhaps the government considered this a star-crossed prosecution, or it concluded that enough resources had been spent on Dillard. In any event, the government offered Dillard a plea agreement under which the then-mandatory Guideline range would have been approximately 15 years in prison, with the right to challenge my ruling denying his motion to suppress. *See generally Case No. 1:99 CR 249, ECF No. 207*, *Nov. 29, 2000 Tr.* at 210-223. While this is certainly a long prison sentence in the abstract, Dillard was facing a mandatory life sentence, plus 7 consecutive years on the gun charge. Dillard had the benefit of seeing how the evidence against him would unfold in the courtroom, as the first trial went to conclusion, and some of the witnesses had testified again in the second trial. I explained all of this in painstaking detail to Dillard. *Id*. I gave him my perception of how devastating to the jury was the testimony of Officer Kennelly, who had recounted in detail how he feared for his life as he struggled with Dillard over the gun in Dillard's hand. *Id*. at 213. Dillard's attorney at the time made a point of stating on the record that he had advised Dillard he'd probably only be looking at 9½ to 10 more years of prison time, taking into consideration past and future good time, his eligibility for a 500-hour drug and alcohol rehabilitation program that would reduce the sentence one year, and the likelihood of spending six months in a halfway house. *Id*. at 219-220. Dillard had a very good lawyer in his first trial (Dennis Terez, who is now the Federal Defender) and there was no way that attorney could diminish the impact of this testimony.

I gave Dillard my opinion that he had a very slim chance of avoiding conviction, and I explained to him that I would have absolutely no discretion at sentencing were he to be convicted. (Check this - I think Dillard asked for a 1-2 day continuance to discuss the plea offer

-14-

with his brother, or another relative, which I granted). Nevertheless, Dillard chose to reject the government's plea offer and to take his chances at trial. Attorney Butler did the best job he could under the circumstances but, as predicted, the jury convicted Dillard. Having sat through Dillard's trial two plus times, I can state with considerable confidence that nothing attorney Butler did, or didn't do, would have affected the outcome. Dillard has not come close to meeting the heavy burden he bears under *Strickland*.

## V.

Based on the foregoing, the remanded claims are hereby **DENIED**.

**IT IS SO ORDERED.**

<u> /s/Dan Aaron Polster     March 1, 2007 </u>
**Dan Aaron Polster**
**United States District Judge**